[ PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 21 2002
THOMAS K. KAHN
CLERK

_____

No. 01-16553

_____

D. C. Docket  Nos. 01-06367-CV-DTKH & 99-26616-BKC-RB

In Re:  FINANCIAL FEDERATED TITLE & TRUST, INC.,

Debtor.

---------------------------------------------------------

RONALEE LEVY ORLICK,

Plaintiff-Appellant,

versus

JOHN W. KOZYAK,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 21, 2002)

Before CARNES, HILL, and KRAVITCH, Circuit Judges.

HILL, Circuit Judge:

Ronalee Levy Orlick appeals a district court order affirming a bankruptcy court final judgment in favor of John W. Kozyak (bankruptcy trustee or trustee) for $1,167,037.19, on three counts of avoidance of payments as fraudulent transfers from Financial Federated Title & Trust, Inc. (FinFed) and American Benefits Services, Inc. (ABS), (collectively, 'debtor'), to Orlick under federal and state law.[1] 11 U.S.C. §§ 548(a)(1)(A), (a)(1)(B); 544(b); Uniform Fraudulent Transfer Act, as adopted at Fla. Stat. § 726.101 *et seq.* (UFTA). Based upon the following, we vacate the order of the district court and remand for jury trial with special instructions.

## I. PROCEDURAL AND FACTUAL BACKGROUND

The main case originated in 1999 when the bankruptcy trustee filed a complaint against Orlick and eight other defendants consisting of Orlick's father, Raphael "Ray" Levy, and seven corporations that Levy, and one other individual, either owned or controlled. The trustee sought to recover approximately $14,000,000 that had been transferred by the debtor to the defendants in an alleged

---

[1] FinFed and ABS were found to be so intertwined, they were deemed one entity by the bankruptcy court.

Ponzi scheme[2] involving viaticated life insurance policies.[3]  The trustee's claims

against Orlick were severed from the main case for non-jury trial before the

bankruptcy court.

The facts involved in Orlick's case are straightforward.  At her father's

behest, Orlick began work in 1998 at ABS.  She claims that it was agreed that she

would be compensated at the rate of one percent (1%) of the gross revenues

generated by ABS, similar to commissions paid to brokers.  It is not disputed that

her responsibilities included organizing the office by computerizing functions,

coordinating office networking, performing payroll, commission and banking

---

[2] *See In re Ponzi*, 15 F.2d 113 (D.Mass.1926).  The term generally describes
a pyramid-type investment scheme where investors are paid profits from newly
attracted investors promised large returns on their principal investments.  Typically
it is not supported by any underlying business venture.  An investor that does
receive money is not receiving income on his or her investment, but merely a
return of his or her own principal, or that of another investor.  More and more
investors are solicited in order that the investors at the top of the pyramid can be
compensated.  Usually the pyramid collapses, the majority of investors never
receive any profits, losing their principal investment as well.

[3] In a viaticated life insurance policy, a terminally ill individual, with a valid,
uncontested life insurance policy (the viator), assigns his or her interests in the
policy to a third party investor at a price less than policy benefits, but payable
immediately.  FinFed was allegedly in the business of seeking viators.  ABS was
allegedly in the business of marketing policies procured through FinFed and
soliciting investors.  The bankruptcy court determined that the Ponzi scheme was
effectuated in classic pyramid fashion by the collection of more than $110,000,000
from investors by ABS, compared to only a concomitant purchase of $8,000,000 in
viaticated life insurance policies by FinFed.

functions, managing employees and acting as human resource director. Later that year Orlick held herself out to the public as a vice-president of ABS.

Both parties agree that Orlick had a limited educational and professional background. She had graduated from high school and attended one and one-half years of community college. She also had computer and data entry vocational training. Orlick had worked as a bank teller for two years, a temporary bank secretary, a graphics art company receptionist and secretary, and a credit union administrative assistant and teller.

Orlick's percentage-based commissions were paid directly by debtor ABS through a conduit corporation, M&M Associates Trust (M&M), ostensibly for tax purposes. During the approximate eighteen months that she worked at ABS, Orlick was compensated in the amount of $1,167,037.19.

As to Orlick, the original complaint simply sought to void a transfer made to her for ten thousand dollars ($10,000). In her initial answer, Orlick did not request a jury trial. Three months later, an amended complaint was filed. It increased the demand against Orlick from ten thousand dollars ($10,000), to over one million dollars ($1,017,647), and added M&M Associates Trust (M&M) as the party

4

conduit through which Orlick received the money.[4]  In her answer to the amended

complaint, Orlick demanded a jury trial.

The bankruptcy trustee filed a motion to strike Orlick's jury demand as

untimely under Fed.R.Civ.P. 38.  After hearing argument, the bankruptcy court

granted the trustee's motion, finding that the amended complaint contained no

additional claims or theories of recovery.  It concluded that as no new issues were

raised in the amended complaint that differed from those alleged in the original

complaint, Orlick was not entitled to revoke her original waiver of jury trial.

The case proceeded to a bench trial before the bankruptcy court.  It found in

favor of the bankruptcy trustee on the fraudulent transfer counts set forth as Counts

I, II and III.  It concluded that $1,167,037.19 in transfers from the debtor to Orlick

were voidable both under the actual fraud and constructive fraud provisions.  *See*

Sections 548(a)(1)(A), (a)(1)(B).  Furthermore, the bankruptcy court held that

---

[4] The amended complaint added M&M as the ninth defendant in the following paragraph 13:

Defendant M&M . . . is a "trust" that may or may not meet the formal requirements of Florida law created to act solely as a conduit to receive and funnel funds from FinFed to ABS to Defendant Orlick. During the calendar years 1998 and 1999 M&M received from ABS transfers totaling at least $1,017,647.00, all or substantially all of which was transferred to Defendant Orlick.

Orlick was not entitled as a matter of law to assert the affirmative defense of 'for value and in good faith' found in Section 548(c) in defending herself against the three counts. After oral argument, the district court affirmed the order of the bankruptcy court in all respects. This appeal followed.

## II. STANDARD OF REVIEW

As "the district court in reviewing the decision of a bankruptcy court functions as an appellate court, we are the second appellate court to consider this case." *Capital Factors, Inc. v. Empire for Him, Inc. (In re Empire for Him, Inc.)*, 1 F.3d 1156, 1159 (11th Cir. 1993). We review questions of law, whether made by the bankruptcy court or by the district court, under a *de novo* standard. *Id. citing Equitable Life Assurance Soc. v. Sublett (In re Sublett)*, 895 F.2d 1381, 1383 (11th Cir. 1990). As the district court makes no fact findings in its function as an appellate court, our review is *de novo*. *Id.* at 1384. We review the findings of fact made by the bankruptcy court for clear error. *Rush v. JLJ, Inc. (In re JLJ, Inc.)*, 988 F.2d 1112, 1116 (11th Cir. 1993).

## III. DISCUSSION

*A. Introduction*

Orlick raises four issues on appeal. We discuss only two: (1) whether the district court improperly denied her right to jury trial in granting the trustee's

motion to strike jury demand; and (2) whether the district court erred in holding, as a matter of law, that Orlick was not entitled to assert the affirmative defense of "for value and in good faith" found in Section 548(c) in defending against the fraudulent transfer counts of I, II and III.[5]

*B.  Right to Jury Trial*

Orlick demanded a jury trial in her answer to the trustee's amended complaint.  At hearing on the trustee's motion to strike her jury demand, the bankruptcy court found, and the district court agreed, that the amended complaint raised no new issues upon which Orlick could demand a jury.  We disagree.

Fed.R.Civ.P. 38(b) provides in relevant part:

> Any party may demand a trial by jury of any issue triable of right by a jury by (1) serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue, and (2) filing the demand as required in Rule 5(d).  Such demand may be indorsed upon a pleading of the party.

In her memorandum in opposition to the trustee's motion to strike jury demand, Orlick contended that:

> The Trustee asserts, incorrectly, that the Amended Complaint did not add any new issues or facts as to the Trustee's claims against

_____

[5] By our vacating the district court order and remanding for jury trial, the remaining issues are moot.

Defendant Orlick. In fact, Defendant Orlick has gone from defending a claim against her for $10,000 (original Complaint) to defending a claim against her for $1,017,647.00 (Paragraph 13 of the Amended Complaint). Clearly this is a difference that warrants a reassessment as to the considerations of requesting a jury trial. This addition of a claim for over a million dollars more than the original complaint is certainly a new factual issue and alleges a new theory of recovery as to this Defendant.

We agree.

This issue is not one of first impression in this circuit. In *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993), this court held that where new plaintiffs raised new issues and claims, defendant's initial waiver of a jury did not preclude him from making an effective jury demand with respect to the new issues and new claims. *Id.* at 1545-46. *See Burns v. C. Lawther*, 44 F.3d 960 (11th Cir. 1995); *Borgh v. Gentry,* 953 F.2d 1309, 1311 (11th Cir. 1992)("[A] court's discretion [to deny a jury trial] is very narrowly limited and must, wherever possible, be exercised to preserve jury trial." (quoting *Beacon Threatres, Inc. v. Westover*, 359 U.S. 500, 510 (1959))); *Guajardo v. Estelle,* 580 F.2d 748 (5th Cir. 1978)(even if a party has waived its right to a trial by jury, that right may be revived, at least as to newly asserted claims, upon the filing of an amended complaint which raises new issues); *Moore v. United States*, 196 F.2d 906, 908 (5th Cir. 1952)(amended

complaint did not revive any waived right to jury trial because it did not raise any new issues which carry a Seventh Amendment right to jury trial).

Here the trustee's original complaint simply sought to void a transfer made to Orlick for $10,000, claiming that she would not be able to demonstrate the provision of services sufficient to earn that amount.[6] Because the relatively nominal amount claimed in the original complaint did not warrant a jury trial, it is not surprising that a jury demand was not made.

After being lulled into waiving her right to jury trial, the trustee then presents Orlick with an entirely new, more sophisticated, case. The amended complaint "raises the ante" one hundredfold, from $10,000 to $1,017,647.00, contending now that these allegedly voidable sums passed through a conduit corporation, M&M, added as a new defendant. The case has changed. Orlick must now defend herself against her alleged legal incapacity to show any entitlement to $10,000 in funds, to defending herself against a claim that amounts paid to her were far greater than she would ever be entitled to receive. This is an entirely

---

[6] As, admittedly, Orlick had worked for the debtor for approximately eighteen months, it would likely have justified the receipt of $10,000 in payroll benefits even by hourly wage standards. Thus the trustee would prevail only on a holding that she was legally not entitled to prove *any* justification for *any* payment.

different case with new issues that force new methods of defense.[7]  *See LaMarca*,

995 F.2d at 1545-46.  As to this new case, Orlick's right to a jury trial is revived.

    *C.  "For Value and in Good Faith" under Section 548(c)*

Here the bankruptcy court found, and the district court affirmed, that the

transfers from the debtor to Orlick were voidable pursuant to Sections

548(a)(1)(A)(actual fraud) and (a)(1)(B)(constructive fraud).  They read:

> The trustee may avoid any transfer of an interest of the
> debtor in property, or any obligation incurred by the
> debtor, that was made or incurred on or within one year
> before the date of the filing of the petition, if the debtor
> voluntarily or involuntarily–
>
> (A) made such transfer or incurred such obligation with actual
> intent to hinder, delay, or defraud any entity to which the debtor
> was or became, on or after the date that such transfer was made
> or such obligation was incurred, indebted; or
>
> (B)(i) received less than a reasonably equivalent value in
> exchange for such transfer or obligation; and
>    (ii)(I) was insolvent on the date that such transfer was made
> or such obligation was incurred, or became insolvent as a result
> of such transfer or obligation;
>       (II) was engaged in business or a transaction, or was
> about to engage in business or a transaction, for which any

---

[7] In the real world of litigation today, including the costs incident to such litigation, a decision to waive a jury trial when defending against a $10,000 claim is light years away from such a decision when confronted with a $1,000,000 claim. Practically speaking, the expenses of litigating a jury case are considerably higher than a bench trial.

property remaining with the debtor was unreasonably small capital; or
  (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

Section 548(a)(1)(A) and (a)(1)(B).

Both courts found as a matter of law that Orlick was not entitled to the affirmative defense set forth in Section 548(c) that she took such transfers for value and in good faith.  It reads:

> . . . [A] transferee or obligee of such [an otherwise voidable] transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

Section 548(c).

Both the district court and the bankruptcy court in this case relied upon *In re Randy*, 189 B.R. 425 (Bankr. N.D. Ill. 1995), a summary judgment holding based upon affidavits.  *Randy* held that brokers, paid a commission based upon a percentage of their sales made from soliciting investors in what turned out to be a debtor's Ponzi scheme, were not entitled to the affirmative defense of Section 548(c) as a matter of law "whether or not they had any culpable intent." *See Randy*, 189 B.R. at 438, 442.

11

In *Randy*, the trustee was seeking to retrieve commissions paid to three defendant brokers for their efforts in coopting new investors into a Ponzi scheme. *Id.* at 438. These brokers were also paid commissions for inducing persons who had already invested in the scheme to keep their principal investments in place so that the Ponzi scheme would not collapse. *Id.*

Citing an unreported memorandum decision, *Wilson v. RHS & Associates (In re Blazo Corp.)*, 1994 WL 456881 (Bankr. N.D. Ohio 1994), the *Randy* court held that Section 548(c) was not available as a matter of law to brokers because they assisted in perpetuating the scheme, therefore "no value was or could be legally given." *Randy*, 189 B.R. at 442. It found it unnecessary to reach the question of good faith.[8] *Id.*

In *Blazo*, however, the agents were "asserting a claim for their efforts and expenses in furtherance of an illegal contract . . ." and "[t]he defendants worked, *by their own admission*, assiduously and effectively to advance the debtor's nefarious

---

[8] The *Randy* court further found: "It is possible that others providing ordinary services to Randy not involving the Ponzi scheme, especially employees of the Debtor, might have deserved to be paid for their services because they acted in good faith and gave value to the debtor. Not so with these Defendants who received a form of profit from their work selling the Ponzi scheme." *In re Randy*, 189 B.R. at 442.

scheme." *Id.* (emphasis added). In essence, *Randy* took *Blazo* one step further by eliminating the element of culpable intent.[9]

We disagree with the rationale of *Randy*. The better reasoned cases germinate from the 1986 case of *Merrill v. Allen (In re Universal Clearing House Co.)*, 60 B.R. 985 (D.Utah 1986), a case never mentioned in the *Randy* decision. *Universal Clearing House* involved a Ponzi scheme where 127 sales agents received commission payments for inducing investors to invest in certain clearinghouses. 60 B.R. at 989. The bankruptcy court "held as a matter of law that because the [brokers'] services deepened the debtors' insolvency and furthered a fraudulent scheme, the services were 'without legally cognizable value.' " 60 B.R. at 998. The district court disagreed. In reversing the bankruptcy court, it stated:

> The fact that the services appellants performed increased the debtors' insolvency does not preclude a determination that the appellants gave value. By definition, a Ponzi scheme is driven further into insolvency with each transaction. Therefore, by the trustee's reasoning, no one who in any way dealt with, worked for, or provided services to the debtors could prevent avoidance of any transfers they received. The debtors' landlord, salaried employees, accountants and attorneys, and utility companies that provided services to the debtors all assisted the

---

[9] *See, however, Hirsch v. Cahill (In re Colonial Realty Co.)*, 210 B.R. 921, 923 (Bankr. D. Conn. 1997)(in a case where the defendant-broker denied knowledge of a Ponzi scheme, the court distinguished the 'apparent conclusion' of the *Randy* court that in *Randy* the salespeople knowingly worked to advance the scheme).

debtors in the furtherance of their fraudulent scheme.  In spite of this fact, we do not think that the goods and services that these persons and entities provided were without value or that transfers to them could be set aside as fraudulent conveyances.  We see no material distinction between such persons or entities and appellants.  All were necessary to the success of the debtors' scheme. [60 B.R. at 999, footnotes omitted.]

***

We conclude that a determination of whether value was given under Section 548 should focus on the value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise.  We therefore hold that, as a matter of law, the services provided by appellants did constitute value as that term is used in section 548. [60 B.R. at 1000.]

The district court in *Universal Clearing House* then remanded the case to the bankruptcy court for a determination of whether the services the brokers performed were reasonably equivalent in value to the payments they received.  *Id.* at 998.

*Universal Clearing House* has spawned a line of recent cases which also decline to follow *Randy*.  *See Balaber-Strauss v. Lawrence (In re Churchill Mortg. Inv. Corp.),* 256 B.R. 664 (Bankr. S.D.N.Y. 2000), *aff'd* 264 B.R. 303 (S.D.N.Y. 2001)(where commissions paid to brokers for originating mortgages and soliciting additional investors in good faith, without knowledge that debtor was operating Ponzi scheme, were not subject to avoidance as constructively fraudulent transfers); *Cuthill v. Greenmark, LLC, et al. (In re World Vision Entm't., Inc.),* 275 B.R. 642 (Bankr. M.D. Fla. 2002)(where courts must assess 'for value and in good

14

faith' for purposes of Section 548(c) on a case-by-case basis looking at the surrounding circumstances and focusing on the precise transfer in question); *Solow v. Reinhardt (In re First Commercial Mgmt., Inc.)*, 279 B.R. 230 (Bankr. N.D. Ill. 2002)(where value and good faith are issues of fact).

Based upon this line of precedent, under a *de novo* review, we conclude that the district court and the bankruptcy court erred in relying upon *Randy* in determining that Orlick was barred as a matter of law of asserting her affirmative defense under Section 548(c) of 'for value and in good faith.' Upon remand, special instructions will be given to this effect.

## IV. CONCLUSION

We vacate the order of the district court affirming the order of the bankruptcy court and remand this case for jury trial. In addition, the district court is specially instructed that Orlick is not barred as a matter of law from attempting to demonstrate or prove at trial the value of the amount, if any, rendered by her to the debtor under Section 548(c), and whether or not this amount was rendered in good faith.

VACATED and REMANDED with SPECIAL INSTRUCTIONS.


CARNES, Circuit Judge, concurring specially:

15

I concur in this court's opinion with the understanding that on remand after evidence is offered on the value of Orlick's services and the jury returns its verdict on that issue, the  court retains its usual authority and has the duty, upon proper motion, to decide any issue relating to the amount of the verdict.  Our opinion neither expresses nor implies any view that Orlick's services to ABS during the eighteen months she worked there were worth $1,167,037.19, which is the amount she was paid.  Given the facts and circumstances in the record so far, it is utterly inconceivable that her services were worth that much, but how much less than that they were worth is up to the jury to determine in the first instance, subject to review thereafter by the court if the issue is properly raised.