[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-13774

_____

In re: AMERICA-CV STATION GROUP, INC., et al.,

Debtor.

_____

_____

EMILIO BRAUN,
RAMON DIEZ BARROSO,
PEGASO TELEVISION CORP.,

Plaintiffs-Appellants,

versus

AMERICA-CV STATION GROUP, INC.,
AMERICA-CV NETWORK, LLC,
CARIBEVISION HOLDINGS, INC.,

2                    Opinion of the Court                    21-13774

CARIBEVISION TV NETWORK, LLC,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cv-23120-DPG

_____

Before WILLIAM PRYOR, Chief Judge, JILL PRYOR, and GRANT,
Circuit Judges.

GRANT, Circuit Judge:

Just before the Chapter 11 reorganization plans of
Caribevision Holdings, Inc. and Caribevision TV Network, LLC
were set to be confirmed, the debtors filed an emergency motion
to modify the plans under 11 U.S.C. § 1127(a). The initial plans
called for equity in the reorganized companies to be split between
four shareholders: Ramon Diez-Barroso, Pegaso Television Corp.,
Emilio Braun, and Vasallo TV Group. The modification, after
being approved by the bankruptcy court, stripped the first three of
their equity and allocated full ownership to the fourth—a company
controlled by the debtors' Chief Executive Officer.

Taken by surprise, the three ousted shareholders, who
collectively call themselves the Pegaso Equity Holders, now

challenge the bankruptcy court's order granting the debtors' emergency motion to modify the reorganization plans. They contend that they were entitled to a revised disclosure statement and a second opportunity to vote on the plans under Federal Rule of Bankruptcy Procedure 3019(a)—a procedural protection the bankruptcy court did not provide them. We agree. When a modification to a Chapter 11 reorganization plan materially and adversely affects the treatment of a class of claim or interest holders, those claim or interest holders are entitled to a new disclosure statement and another opportunity to vote. Because the modification materially and adversely affected the Pegaso Equity Holders, we reverse and remand to the bankruptcy court.

## I.

Caribevision Holdings, Inc. and Caribevision TV Network, LLC are holding companies of a set of Spanish-language television networks in South Florida, Puerto Rico, and New York. These networks air live daily news and entertainment programming. With an audience of over 12 million viewers, they claim to operate the largest independent Spanish-language television conglomerate based in the United States.

The networks were beset with financial difficulties stemming from, among other things, litigation with shareholders, debt owed to creditors, and the impact of Hurricane Maria's landfall in Puerto Rico. In May 2019, the holding companies—along with two operating companies they own—filed voluntary petitions for Chapter 11 bankruptcy. The Chapter 11 proceeding

would restructure the companies' debt obligations while maintaining ongoing operations. Each company authorized Carlos Vasallo, the networks' President and Chief Executive Officer, to make all decisions regarding the Chapter 11 petitions.

To finance the discharge of debt obligations and maintain operations, the proposed reorganization plans called for the post-petition holding companies' equity holders to make a new $500,000 capital contribution and execute a $1.6 million line of credit. The new equity in the reorganized holding companies was to be allocated in proportion to the amount of capital each post-petition shareholder contributed.[1] To achieve this, the plans "cancelled and extinguished" the equity interests in the pre-petition entities and "[s]imultaneously" issued new equity interests in the reorganized holding companies. The three Pegaso Equity Holders were each to receive individual shares that collectively amount to 65.8% of the equity interests in each reorganized holding company—50.1% to Diez-Barroso, 11.9% to Pegaso Television Corp., and 3.8% to Braun. The remainder was to go to the Vasallo TV Group, LLC—a company owned by Carlos Vasallo. The plans classified all the equity interest holders together into the same class—Class 3.

---

[1] Ramon Diez-Barroso, the Vasallo TV Group, and Pegaso Television Corp. all owned equity in the pre-petition holding companies. The record is unclear as to Emilio Braun's equity interests.

At first this bankruptcy case was proceeding like any other. The debtors submitted the plans to the bankruptcy court along with a disclosure statement. Minor objections were made; an amended disclosure statement was filed. The bankruptcy court approved it, votes on the reorganization plans were solicited, and ballots were filed. A year into the bankruptcy, everything was going according to plan.

Until it wasn't. Two weeks before the confirmation hearing, the same day as the deadline to cast a ballot, the debtors informed the Pegaso Equity Holders that they needed the exit financing three days before the confirmation hearing. The debtors believed that this was necessary to comply with their view of the bankruptcy court's requirement to certify that funding was available. But the Pegaso Equity Holders assert that this was unexpected. The reorganization plans, along with the disclosure statement, provided that the financial contributions were to be made "on the Effective Date"—a date that would not occur until after the Confirmation Order became a final order.

The Pegaso Equity Holders missed the debtors' new deadline, although the funds arrived before the confirmation hearing. Vasallo took this opportunity to fund the entire $500,000 equity contribution himself and executed the full line of credit. Once he had done so, the debtors—still under his control—filed an emergency motion to modify the reorganization plans in Vasallo's favor. Because he was now providing all the exit financing, the

modification proposed to give him all of the equity in the reorganized holding companies.

The emergency motion was not served on the Pegaso Equity Holders, who had not yet entered an appearance in the bankruptcy court. The record reflects that they knew of (and privately objected to the idea of) a contemplated modification, but there is no evidence that they knew the motion was filed or were aware of its specific terms. To the contrary, in a series of emails exchanged between the parties in the hours leading up to the confirmation hearing, the debtors assured the Pegaso Equity Holders that they would "try to resolve the situation."

To that end, the debtors (again, controlled by Vasallo) appeared to work with the Pegaso Equity Holders to facilitate the transfer of their portion of the equity contribution and execution of the line of credit. The debtors continued to coordinate the wire transfer and line of credit from the Pegaso Equity Holders even after Vasallo had covered the entire equity contribution himself and even after the debtors had filed the emergency motion requesting modification of the plans in favor of Vasallo.

The debtors received the full wire transfer in their trust account from the Pegaso Equity Holders the day before the confirmation hearing. Despite that payment, they went forward with the hearing on their emergency motion to modify the plans. At that hearing—which the Pegaso Equity Holders did not attend—the debtors informed the bankruptcy court that the equity contributions from the Pegaso Equity Holders were in their trust

account. But they proceeded with the modifications in any event. They told the court that because they also had the $500,000 from Vasallo, they intended to return the funding to the Pegaso Equity Holders and proceed with the modified plans. The bankruptcy court approved the modifications and did not require a new disclosure statement or the resolicitation of votes.

The court immediately proceeded to consider confirmation. Confirmation of a Chapter 11 plan typically requires the impaired classes of creditors and equity interest holders to accept the plan. 11 U.S.C. § 1129(a)(8). When it came time to count the votes, no one in Class 3—the equity interest holders of the pre-petition holding companies—had cast a ballot. But under the Code, if a plan provides that the interests of a class do not entitle the interest holders to "receive or retain any property under the plan on account of" their interests, then they are "deemed not to have accepted a plan." 11 U.S.C. § 1126(g). The court read the initial reorganization plans to extinguish the pre-petition equity interests without giving those interest holders anything in return. So the court's solution was to "deem" that Class 3 had rejected the plans. It then confirmed the modified plans via a "cramdown" over the deemed dissent of the Class 3 interest holders. *See* 11 U.S.C. § 1129(b).

The Pegaso Equity Holders were given no reason to believe they would lose their equity interests at the confirmation hearing. After all, the debtors had assured them that they were seeking a solution and had actively worked to coordinate the wire transfer in

the days before the hearing. The Pegaso Equity Holders had invested over $65 million into the companies and held equity in the debtors since their inception. Braun attested that he was "unaware until after the Confirmation Hearing" that his "equity interests in the Debtors would be formally extinguished." Braun and the rest of the Pegaso Equity Holders did not have reason to expect to lose their equity in a bankruptcy proceeding that focused on addressing debts owed to third parties.

Two days after the bankruptcy court's order confirming the plans, the Pegaso Equity Holders moved for the court to reconsider the confirmation order to the extent that it adopted the modification. They argued that they had timely performed their funding obligations under the plans, were entitled to disclosure of the contemplated modification, and should regain the equity interests they had lost. They also moved to strike the effective date to prevent the debtors from moving to substantial consummation of the plans as it related to the issuance of equity. As a remedy, they requested only reallocation of the equity interests in the reorganized holding companies. They did not want to disrupt the broader reorganization process.

The bankruptcy court denied the motions, ruling that the Pegaso Equity Holders did not present newly discovered evidence and that there was no manifest error of law or fact in granting the motion to modify. The court reasoned that the Class 3 interest holders were not entitled to additional disclosure and voting because they had already been deemed to have rejected the original

21-13774                Opinion of the Court                9

bankruptcy plan.  Relying on an out-of-circuit bankruptcy court decision, the court said that the "law is clear that modifications to a plan only require further disclosure and resolicitation in respect of those parties who previously voted for the Plans."  The bankruptcy court also rejected the Pegaso Equity Holders' claim that they were denied due process because they were not served with the motion to modify.  And it denied as untimely the motion to strike the effective date.

The Pegaso Equity Holders next took their case to the district court and repeated the arguments they had made in their motion for reconsideration.  The district court agreed with the bankruptcy court.  It said that "a class of creditors or equity interest holders who have not accepted a plan have no say in whether that plan can be modified."  The bankruptcy court's orders were thus affirmed.

The Pegaso Equity Holders now appeal to this court.

## II.

In bankruptcy cases we sit "as a second court of review" that examines the bankruptcy court's factual and legal determinations independently.  *In re Optical Techs., Inc.*, 425 F.3d 1294, 1299–1300 (11th Cir. 2005) (quotations omitted).  We review the bankruptcy court's factual findings for clear error, and any legal conclusions by it or the district court de novo.  *Id.* at 1300.

### III.

### A.

Modifying a Chapter 11 reorganization plan before confirmation is relatively easy: the "proponent of a plan may modify such plan at any time before confirmation." 11 U.S.C. § 1127(a). This is by design. The Bankruptcy Code seeks to facilitate negotiation between the debtor and its creditors, equity holders, and other interested parties. 7 Collier on Bankruptcy ¶ 1127.03[1] (16th ed. 2022). Easy modification allows negotiated outcomes to quickly become part of the plan.

But there are a few constraints. The modified plan must still comply with the Code's substantive requirements for any reorganization plan. 11 U.S.C. § 1127(a). This means that the modification must comply with § 1122's restrictions on the classification of claims and interests and § 1123's requirements for the contents of a reorganization plan. *Id.* An important substantive requirement for our purposes is found in § 1123(a)(4). Unless the disfavored class members consent, the modified plan must "provide the same treatment for each claim or interest of a particular class." *Id.* § 1123(a)(4).

There are also procedural constraints. A modification must comply with § 1125's requirement that claim and interest holders be given "adequate information" about the contents of a plan. *Id.* § 1127(c). Before a modification is filed, this is accomplished in a disclosure statement, which must be approved by the bankruptcy

court as containing adequate information. *Id.* § 1125(b); Fed. R. Bankr. P. 3016(b). A sufficient statement ensures that investors can make an informed vote. *See* 11 U.S.C. § 1125(a)(1).

Under certain circumstances, when a modification is made after votes are cast based on an old disclosure statement, the debtor must provide a new disclosure statement and call for another round of voting. *In re New Power Co.*, 438 F.3d 1113, 1117–18 (11th Cir. 2006). But not all modifications trigger this requirement. A claim or interest holder is entitled to this procedural protection only if, after a hearing, the bankruptcy court finds that the modification "materially and adversely changes the way that claim or interest holder is treated." *Id.* Because these determinations are mixed questions of law and fact, we review them de novo. *Id.* at 1117.

The Pegaso Equity Holders argue that the bankruptcy court erred by skipping this review for materiality and adversity, as well as the new disclosure and voting that would follow from a correct decision on those issues. We agree. As we see it, the original plans gave the Pegaso Equity Holders the exclusive opportunity to obtain 65.8% of the equity interests in the reorganized holding companies. The sole purpose of the modification was to strip them of this equity. The modification therefore "materially and adversely" changed the way the Pegaso Equity Holders were treated under the plans, entitling them to a new disclosure statement and a second chance to cast a ballot.

The lower courts reasoned that because the Pegaso Equity Holders were deemed to have rejected the unmodified plans, additional disclosure and resolicitation were not required. This is wrong on two fronts. First, because the Class 3 interest holders were entitled to property under the plans (the opportunity to obtain 65.8% of the equity interest in the reorganized companies), the bankruptcy court was not permitted to deem them as having rejected the plans under 11 U.S.C. § 1126(g). And second, even if we were to counterfactually assume that they did reject the plans, interest holders that previously rejected (or did not vote for) a reorganization plan are still entitled to additional disclosure and voting if the treatment of their interests is materially and adversely affected by a modification.

### 1.

We start with the first error—deeming the Pegaso Equity Holders to have rejected the plans. Section 1126 provides a set of voting rules that govern the confirmation of Chapter 11 plans. For a class of interest holders to accept a plan, holders of at least two-thirds of the interests voting must vote in its favor. 11 U.S.C. § 1126(d). But under § 1126(g), if the plan provides that the claims or interests of a class do not entitle the holders to "receive or retain any property under the plan on account of such claims or interests," then the class will be "deemed not to have accepted a plan." *Id.* § 1126(g). On the other hand, if the unmodified plans did entitle the Class 3 interest holders to receive property on account of their pre-petition equity interests, then § 1126(g) does

not apply—meaning the bankruptcy court could not deem the Pegaso Equity Holders to have rejected the plans. So the question is whether the Pegaso Equity Holders were entitled to receive or retain property under the unmodified plans on account of their interests.

Answering that question, it turns out, is straightforward because of Supreme Court precedent. In *Bank of America National Trust*, the Court analyzed a similar Chapter 11 plan in which the former partners of the debtor received ownership in a reorganized partnership in exchange for capital contributions. *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 440 (1999). A more senior creditor, however, would not be paid in full. *Id.* at 439–440, 442. The senior creditors invoked the "absolute priority rule," which bars junior claim or interest holders from receiving or retaining property when senior claim or interest holders do not. *Id.* at 442; 11 U.S.C. § 1129(b)(2)(B)(ii). So the question was whether the former partners (the junior account holders) had received or retained property on account of their interests—the same question at issue here. *Bank of Am. Nat'l Tr.*, 526 U.S. at 437, 442. The Court said yes; it characterized the former partners as having received an exclusive opportunity to obtain equity in the reorganized entity. *Id.* at 455. And that opportunity qualified as a property interest received on account of their partnership interest in the pre-petition entity. *Id.* at 455–56; *accord id.* at 460 (Thomas, J., concurring in the judgment).

It is true that, as the lower courts noted, the plans here state that the equity interests held by the Class 3 interest holders "shall be extinguished on the Effective Date . . . ." But if one reads on, the same sentence continues and establishes *new* equity interests: ". . . and New Equity Interests in the Reorganized Debtor shall be issued to the following Persons in the following percentages on the Effective Date: (i) Ramon Diez-Barroso – 50.1%, (ii) Vasallo TV Group, LLC – 34.2%, (iii) Pegaso Television Corp. – 11.9%, and (iv) Emilio Braun – 3.8%." This new equity is in proportion to the amount of the equity contribution each interest holder would provide, specified elsewhere in the plans.

For our purposes, these plans are not materially different from the plans at issue in *Bank of America National Trust*. Like the former partners there, the Class 3 interest holders here were set to receive equity in the reorganized entities in exchange for a capital contribution. And like the former partners, the Class 3 interest holders were in a position to make that equity contribution because of their status as pre-petition equity holders.

The lower courts therefore mischaracterized the reorganization plans. Yes, the pre-petition equity interests were "extinguished." But on account of their status as holders of those interests, the Class 3 interest holders received an exclusive opportunity to obtain equity in the reorganized companies. This was not an opportunity offered to the world at large; it was one offered exclusively to these four shareholders. As the Supreme Court explained, this is a property interest because of "its

protection against the market's scrutiny of the purchase price by means of competing bids." *Bank of Am. Nat'l Tr.*, 526 U.S. at 456. Such an exclusive opportunity to obtain equity is a property interest received on account of interests in the pre-petition companies. *Id.* at 455.

If that were not enough, the voting provisions of the plans point to the same conclusion. The plans state—multiple times— that the Class 3 interest holders were entitled to vote. But, as we've discussed, former equity holders who simply have their interests extinguished are not entitled to vote as a function of § 1126(g). *See* 11 U.S.C. § 1126(g). By nevertheless giving the Class 3 interest holders voting rights, the plans implicitly concede that the Pegaso Equity Holders were entitled to receive or retain property.

Because the Class 3 interest holders were entitled to receive property under the plans on account of their interests, § 1126(g) does not apply. Consequently, without a formal rejection from the Pegaso Equity Holders, the bankruptcy court had no basis for deciding that they had rejected the unmodified plans. So even under the bankruptcy court's flawed interpretation of Bankruptcy Rule 3019(a), the court erred in denying the Pegaso Equity Holders a new disclosure statement and vote.

**2.**

We now move to that flawed interpretation—the bankruptcy court's second error. The bankruptcy court improperly narrowed Bankruptcy Rule 3019(a) by construing it to

require additional disclosure and voting only when a claim or interest holder materially or adversely affected by a proposed modification had previously voted to accept the plan.

This interpretation contravenes the text of the rule. The rule provides that if the court finds that "the proposed modification does not adversely change the treatment of the claim of *any* creditor or the interest of *any* equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan." Fed. R. Bankr. P. 3019(a) (emphasis added). The key word here is "any." "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (citation omitted); *accord Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1186 (11th Cir. 1997). The repeated use of the word "any" refers to creditors or equity security holders of whatever kind. The text does not permit any narrower interpretation. The rule therefore requires additional disclosure and voting if the modification materially and adversely affects any creditor or interest holder, not just those voting to accept the plan.

Our precedent likewise does not distinguish between classes. We have said that "the bankruptcy court may deem a claim or interest holder's vote for *or against* a plan as a corresponding vote in relation to a modified plan unless the modification materially and adversely changes the way that claim or interest holder is treated." *New Power*, 438 F.3d at 1117–18 (emphasis

added). "If it does," we continued, "the claim or interest holder is entitled to a new disclosure statement and another vote." *Id.* at 1118. The text of the rule and our precedent thus both make clear that if a modification materially and adversely changes the treatment of any claim or interest holder who has not accepted the modification in writing, then that claim or interest holder is entitled to a new disclosure statement and resolicitation of votes. So too here.

## B.

The debtors argue that any error committed by the bankruptcy court was harmless. They note that the Pegaso Equity Holders had some notice of the contemplated modification and in any event were deemed to have rejected the plans. As they put it, the bankruptcy court treated the Pegaso Equity Holders exactly as they ask—as having rejected the plans. But that is an incomplete view.

To be sure, for a creditor or equity interest holder that already voted to reject a plan, a second rejection vote in response to a modification that materially and adversely affects its interest will have little effect. On the other hand, a creditor or equity interest holder that previously voted to accept a plan benefits from the added disclosure and revoting because it can change its vote to reject the plan—recourse not available to a creditor or equity interest holder that voted to reject the initial plan.

But a dissenting vote on a Chapter 11 plan does not give the debtor a free pass to modify the plan to the detriment of that dissenting claim or interest holder. This case shows exactly why a new disclosure statement can protect a claim or interest holder who previously voted to reject the plans. A new disclosure statement with additional time to vote would have given the Pegaso Equity Holders an opportunity to object to the modification on substantive grounds.

And on substantive grounds, there were serious problems. The debtors' modification stripped the Pegaso Equity Holders of the exclusive opportunity to obtain equity interests and reallocated it to the Vasallo TV Group. As a result, within the Class 3 interest holders, one member received property under the plan and the others received nothing. That was improper. All modifications, including this one, must comply with § 1123. 11 U.S.C. § 1127(a). That section requires that the plans provide "the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." *Id.* § 1123(a)(4). The plans as modified violate this requirement by treating the Pegaso Equity Holders less favorably than the Vasallo TV Group. Without the consent of the Pegaso Equity Holders, the modification was not allowed.

For that same reason, the modified plans were improperly confirmed. A plan may be confirmed only if it "complies with the applicable provisions" of Chapter 11. *Id.* § 1129(a)(1). Here,

because the modified plans did not comply with § 1123(a)(4), they could not meet that standard. Accordingly, to the extent that the plans incorporated the modification, confirmation was also improper.

These substantive errors show why whatever notice the Pegaso Equity Holder's might have had does not render the bankruptcy court's errors harmless. When confirming a plan without the consent of all impaired classes under § 1129(b), bankruptcy courts have an "independent duty" to ensure that § 1129's requirements are met "with regard to impaired dissenting classes of creditors in a Chapter 11 cram down." *In re Lett*, 632 F.3d 1216, 1229 (11th Cir. 2011). This means that the bankruptcy court "must consider" facts relating to the criteria of § 1129 "even in the absence of an objection." *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1299–1300 n.4 (11th Cir. 2001). The Pegaso Equity Holders therefore did not have an obligation to even make an objection— it was the bankruptcy court's independent obligation to ensure that the plans did not discriminate within a class. Had the bankruptcy court recognized that the Class 3 interest holders received property under the plans, it could not have granted the modification or confirmed the modified plans because the Vasallo TV Group was treated more favorably than the rest of Class 3. *See* 11 U.S.C. §§ 1129(a)(1), 1123(a)(4).

Moreover, the notice the Pegaso Equity Holders did receive—notice of a *contemplated* modification on the day before the confirmation hearing—is not the same as the disclosure

required by the Code.  Had the Pegaso Equity Holders received the additional disclosure to which they were entitled, they could have cast an actual vote rejecting the modified plans *and* presented their objections to the court.  At that point, they could have explained that the modification discriminated within Class 3 without their consent in violation of § 1123(a)(4).

The notice the Pegaso Equity Holders received did not give them this opportunity because it lacked sufficient detail of the terms of the modification and came just hours before the confirmation hearing.  The distinction between notice of the motion to modify and additional disclosure is all the more important here because debtor's counsel, after filing the motion to modify, falsely assured the Pegaso Equity Holders that he wanted to be helpful and would try to resolve the situation—all while moving full speed ahead on the modification in the bankruptcy court.

For these reasons, the bankruptcy court's subsequent notice finding does not insulate its errors as harmless.  Ensuring that interest holders that are materially and adversely affected by last-minute modifications receive an opportunity to review the modification and consider whether to change their vote or present

21-13774                Opinion of the Court                21

an objection is a primary benefit of the procedural requirements. That benefit should have been available here.[2]

## IV.

We end by considering the remedy. In bankruptcy cases we are mindful that we must strike "the proper balance between the equitable considerations of finality and good faith reliance on a judgment and the competing interests that underlie the right of a party to seek review of a bankruptcy court order adversely affecting him." *In re Club Assocs.*, 956 F.2d 1065, 1069 (11th Cir. 1992). Below, the debtors moved to dismiss this appeal as equitably moot. The district court denied that motion based on its review of the record, stating that "it is possible to grant effective judicial relief." The debtors do not challenge that order on appeal, nor do

---

[2] The Pegaso Equity Holders also raise a constitutional due process challenge. But "federal courts should avoid reaching constitutional questions if there are other grounds upon which a case can be decided." *BellSouth Telecomms., Inc. v. Town of Palm Beach*, 252 F.3d 1169, 1176 (11th Cir. 2001). Because we resolve this case on non-constitutional grounds, we decline to consider the constitutional due process question.

For different reasons, we also do not wade into the parties' dispute over the proper deadline to provide the equity contribution and exit financing. As we explained, the bankruptcy court's review of a modification under § 1127(a) is narrow. It is limited to assessing whether the modification complies with sections 1122, 1123, and 1125 of the Code. 11 U.S.C. § 1127(a). The court is not tasked with assessing the reasonableness of the modification or its justifications. Accordingly, we do not consider or decide whether the debtors were correct that the exit funding and financing needed to be provided before the confirmation hearing.

they raise equitable mootness in their briefings.  We therefore assume that this appeal is not equitably moot, and that relief can be granted.

At the same time, we recognize that it has been over two years since these plans were confirmed and that they have been substantially consummated.  In reversing the order granting the motion to modify the reorganization plans, we assume that it remains true today that effective judicial relief can be granted.  But we leave the exact contours of that relief to the bankruptcy court in the first instance.  We therefore remand to the bankruptcy court to fashion an equitable remedy.

★    ★    ★

The bankruptcy court erred in granting the debtor's modification without first requiring that the debtor provide the Pegaso Equity Holders with a revised disclosure statement and a second opportunity to cast a ballot.  We therefore **REVERSE** the order granting the debtor's emergency motion to modify the reorganization plans, **REVERSE IN PART** the bankruptcy court's order confirming the reorganization plans to the extent that it adopts the modification, and **REMAND** to the bankruptcy court to fashion an equitable remedy consistent with this opinion.